[Tagged]



**ORDERED in the Southern District of Florida on December 22, 2016.**

**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re                                              **CASE NO. 14-23126-EPK**
                                                   **CHAPTER 7**
**D.I.T., Inc.,**

          **Debtor.**
_____/
**MICHAEL R. BAKST, not individually**          **ADV. PROC. NO. 16-01214-EPK**
**but as Chapter 7 Trustee,**

          **Plaintiff,**
**v.**

**BANK LEUMI, USA, a New York state**
**chartered bank,**

          **Defendant.**
_____/

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

  **THIS MATTER** came before the Court upon *Bank Leumi's Motion to Dismiss*

*Amended Complaint* (the "Motion to Dismiss") [ECF No. 18] filed by Bank Leumi, USA (the

"Defendant"), and the response and reply related thereto [ECF Nos. 40 and 32].

  This is an action in which the chapter 7 trustee seeks to avoid several payments by a

1

corporate debtor to its commercial lender, including regular payments under and payoff of the loan, allegedly made with actual intent to hinder, delay or defraud creditors. The debtor operated a legitimate business. The debtor obtained term and revolving financing from a commercial lender. The debtor misled that lender in order to maintain its financing, repeatedly misrepresenting the value of its current assets. The debtor made regular payments on the financing according to its terms. When the original financing was about to mature, the debtor obtained replacement financing from another commercial bank. The loan officer previously employed by the original lender was then employed by the replacement lender. The debtor also misled the new lender as to the value of its current assets, thereby avoiding a default on the replacement loan for some time. Eventually the debtor defaulted on its financing. The debtor filed a bankruptcy petition. The debtor's principal and others were convicted of bank fraud. Now the debtor's trustee in bankruptcy seeks to avoid several regular payments made by the debtor on its financing with the initial lender and the payoff of that loan from proceeds of the replacement financing. The trustee argues that these payments were made with actual intent to defraud creditors. The trustee argues that the fraud in question was the debtor's bank fraud. The trustee also argues that the debtor's unsecured creditors were harmed by the perpetuation of the debtor's business. The trustee hints in his amended complaint that the initial lender somehow participated in the debtor's fraudulent misrepresentation of its financial condition to the replacement lender, but there is not a single concrete allegation to support that theory. In the end, there is nothing in the amended complaint to tie the alleged fraud to the transfers the trustee seeks to avoid, other than the bare fact that the debtor was able to maintain its apparently legitimate business for a while longer as a result of the payments and refinancing. The allegations in the amended complaint are not sufficient to support any of the relief requested. The amended complaint

will be dismissed. Although the trustee sought leave to amend, a second time, in its original response to the Motion to Dismiss, that response was superseded, the operative response did not seek leave to amend, and so there is no specific request to further amend the amended complaint. In any case, the trustee's request to amend in his original response does not include any suggestion as to how the amended complaint could be further amended to address the concerns raised in the Motion to Dismiss and the request was procedurally improper. For these reasons, the amended complaint will be dismissed with prejudice.

Michael Bakst, as Chapter 7 Trustee (the "Plaintiff") of the bankruptcy estate of D.I.T., Inc. (the "Debtor"), sues the Defendant to avoid and recover alleged fraudulent transfers the Debtor made to the Defendant under the actual intent provisions of 11 U.S.C. § 548(a)(1)(A), and under the actual intent provisions of the laws of Florida (Fla. Stat. § 726.105(1)(a)) and New York (N.Y. Debt. & Cred. Law § 276) as incorporated by 11 U.S.C. § 544. The last count of the amended complaint seeks recovery of the avoided transfers pursuant to 11 U.S.C. § 550.

On December 20, 2012, the Debtor used $5,127,163.22 borrowed from Bank Hapoalim B.M. to satisfy in full the Debtor's obligations to the Defendant. Prior to that, during the four-year period before the filing of this case, the Debtor made regular payments to the Defendant on the Defendant's outstanding loan. The Plaintiff argues that those regular payments by the Debtor to the Defendant and the payment in full of the loan constitute intentional fraudulent transfers avoidable in this case, and that the Plaintiff is entitled to a money judgment against the Defendant in the aggregate amount transferred.

Because this is a motion to dismiss, the Court accepts as true the allegations in the amended complaint [ECF No. 14]. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Debtor was a wholesaler of beauty products.  Emanuel L. Cohen and his wife, Sally Sue Cohen, owned, operated, and otherwise controlled the Debtor.  From the beginning of 2005 until March 2014, the Debtor, through Mr. Cohen and others, conceived and engaged in a fraudulent scheme to falsify its accounts receivable and to conceal the existence of loans that the Debtor owed to undisclosed third parties.  During this time, the Debtor incurred substantial debts and liabilities which ultimately led to the collapse of its business and discovery of the fraud.  The Debtor induced the Defendant and, later, Bank Hapoalim B.M., to extend millions of dollars of revolving credit and term loans to the Debtor, thereby committing bank fraud.

Several parties assisted Mr. Cohen in perpetrating his fraudulent scheme, including CPA Marc Wieselthier and the accounting firm of Curcio, Wieselthier & Cohen, CPA's, P.C., f/k/a Garfield, Seltzer, Curcio & Wieselthier, CPA's, P.C.; Thomas Thompson, a salesman for the Debtor; and Jay Sosonko, the Debtor's chief financial officer.  Mr. Sosonko admitted that the Debtor, with the knowledge and assistance of the others, "cooked the books" of the Debtor by creating false invoices and accounts receivable.  The Plaintiff does not specifically allege that the Defendant, or its lending officer, participated in this fraud or even had actual knowledge of it.

The banking relationship between the Debtor and the Defendant began in 2001.  Scott Morello, Executive Vice President of the Defendant, was the Debtor's assigned loan officer. Mr. Morello enjoyed a longstanding personal friendship with Mr. Cohen.

From at least 2006 until December 2012, the Debtor had the benefit of a $4.5 million revolving credit facility (the "Revolver") and a $700,000 term loan (the "Term Loan" and, together with the Revolver, the "Bank Leumi Loan Facility"), each provided by the Defendant.  Mr. Cohen personally guaranteed the Bank Leumi Loan Facility.  The Revolver

4

was secured by certain of the Debtor's assets, including its accounts receivable and inventory. The Debtor was required to certify to the Defendant certain financial information on a monthly basis and was required to provide to the Defendant annual and semi-annual financial statements. The Debtor falsified the information it provided to the Defendant. While the Plaintiff alleges that Mr. Morello suggested that the Debtor could obtain additional financing through affiliates of the Debtor formed for that purpose, thereby apparently evading limitations in the Bank Leumi Loan Facility, there is no allegation that Mr. Morello knew the Debtor was misrepresenting its financial condition to the Defendant.

Around mid-2012, Mr. Morello left Bank Leumi and became employed by Bank Hapoalim. In September 2012, Mr. Cohen caused the Debtor to submit a loan application to Bank Hapoalim. Mr. Cohen has testified that Mr. Morello "brought [him] to Bank Hapoalim." While that loan application was pending, the Defendant contacted the Debtor and requested a renewal of its promissory notes. The Plaintiff alleges that the Bank Leumi Loan Facility was either in or about to be declared in default, or, alternatively, was approaching maturity, and that it was becoming clear to the Defendant that the Debtor would not be able to meet its obligations and/or satisfy the loans when they became due. There is no specific allegation to support the Plaintiff's suggestion that the Defendant expected the Debtor to default or to be unable to renew or refinance the Bank Leumi Loan Facility. Indeed, this statement is inconsistent with the fact that the Defendant sought a renewal of its financing with the Debtor at the same time the Debtor was arranging replacement financing with Bank Hapoalim.

On December 12, 2012, Bank Hapoalim, with Mr. Morello acting as the Debtor's loan officer, agreed to extend the Debtor a $4.5 million secured line of credit (the "BH Line of Credit") together with a $700,000 term loan (the "BH Term Loan" and, together with the BH

5

Line of Credit, the "Bank Hapoalim Loan Facility").  Bank Hapoalim issued to the Debtor a commitment letter, dated December 12, 2012, in connection with the Bank Hapoalim Loan Facility.  That commitment letter provided that the BH Term Loan was to be used to pay off the Term Loan held by the Defendant.  The commitment letter also provided that the BH Line of Credit was an "uncommitted line of credit" which "shall be utilized by [Debtor] for general working capital purposes."  Mr. Cohen also guaranteed the Bank Hapoalim Loan Facility.

The Bank Hapoalim Loan Facility closed on December 20, 2012.  At that time, the BH Line of Credit and the BH Term Loan were funded and deposited into an account (the "DIT Account") maintained by the Debtor at Bank Hapoalim.  The DIT Account was an operating account for the Debtor into which other funds were deposited and commingled for business use.  That same day, the Debtor paid off the Bank Leumi Loan Facility, in full, via a single wire transfer from the DIT Account in the amount of $5,127,163.22 (the "Bank Leumi Payoff").  The Plaintiff alleges that, including the Bank Leumi Payoff and regular payments on the Bank Leumi Loan Facility, the Debtor made fraudulent transfers to the Defendant in the aggregate amount of at least $13,342,870.30.

In the Motion to Dismiss the Defendant presents five arguments in favor of dismissal of the amended complaint.  The Court agrees with the Defendant that the amended complaint fails to allege sufficient facts to state a claim for relief based in actual fraud.  The Court first addresses the other four arguments presented in the Motion to Dismiss.

With regard to the Bank Leumi Payoff, the Defendant argues that the transfer did not diminish the assets of the Debtor and so there can be no fraudulent transfer as a matter of law.  The Debtor obtained new loans from Bank Hapoalim and used those loans to pay in full its obligations to the Defendant.  After the Bank Leumi Payoff, the Debtor had the same

6

debt obligations secured by the same collateral.  Bank Hapoalim merely replaced the Defendant.

The Court agrees with the analysis of Judge Paul G. Hyman, Jr. in *Development Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 793-94 (Bankr. S.D. Fla. 2000).  Payment of a pre-existing debt may constitute a fraudulent transfer.  The plain text of both section 548(a)(1) and the relevant state laws makes clear that the inquiry is whether the Debtor intended to hinder, delay, or defraud its present or future creditors when it paid the Defendant, not whether the Debtor's creditors were actually harmed because the transfer diminished assets later included in the Debtor's bankruptcy estate.  *Id.* at 793.  Other provisions of the relevant statutes, *e.g.*, section 548(c), provide affirmative defenses that focus on whether the Defendant received a transfer "for value." *Id.* at 794.  Whether an alleged fraudulent transfer was payment on a pre-existing debt is just one factor that may be used to rebut a possible finding of actual intent to hinder, delay, or defraud.  Lack of diminution of assets of the estate does not, as a matter of law, negate a fraudulent transfer claim and the Motion to Dismiss cannot be granted on that basis.

Next, the Defendant argues that funds used to make the Bank Leumi Payoff were not property of the Debtor under the "earmarking" doctrine.  Typically argued in preference actions, "[u]nder the earmarking doctrine, which is a court fashioned doctrine, a third party makes a loan to a debtor so that the debtor is able to satisfy the claim of a designated creditor." *Bank of Am., N.A. v. Mukamal (In re Egidi)*, 571 F.3d 1156, 1162 (11th Cir. 2009) (citing *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1356 (5th Cir. 1986)).  In such a case, "the proceeds do not become part of the debtor's assets, and no preference is created." *Id.*  This is because the "assets from the third party were never in the control of the debtor and therefore payment of these assets to a creditor in no way diminishes the debtor's

7

estate." *Id.* One iteration of the earmarking doctrine requires the following: (1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt, (2) performance of that agreement according to its terms, and (3) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate. *McCuskey v. The Nat'l Bank of Waterloo (In re Bohlen Enters., Ltd.)*, 859 F.2d 561, 566 (8th Cir. 1988).

The Eleventh Circuit has not expressly applied the earmarking doctrine, even in preference actions. *In re Egidi*, 571 F.3d at 1162. However, courts in the Eleventh Circuit have analyzed the concept of "property of the debtor," sometimes in the fraudulent transfer context, by looking to a debtor's control of the property transferred. *Dillworth v. Ginn (In re Ginn La St. Lucie, LLLP),* No. 10-2976-PGH, 2011 Bankr. LEXIS 3705, at *20-*30 (Bankr. S.D. Fla. Apr. 18, 2011) (reviewing cases and examining the control test).

The Defendant argues that the BH Line of Credit was used to satisfy the Defendant's Revolver, and that the BH Term Loan was used to satisfy the Defendant's Term Loan. But there is no allegation that the Debtor was in any way bound to use the proceeds of the BH Line of Credit to pay the Defendant's Revolver. Indeed, it appears that the BH Line of Credit was "uncommitted" and to be used "for general working capital purposes." While the amended complaint mentions a provision of Bank Hapoalim's commitment letter requiring the Debtor to use the proceeds from the BH Term Loan to satisfy the Defendant's Term Loan, there is no allegation that the commitment letter remained a binding contract after the closing of the Bank Hapoalim Loan Facility (which would be unusual). It is not obvious from the face of the amended complaint that the Debtor lacked control of the funds used to make the Bank Leumi Payoff, and so the Motion to Dismiss cannot be granted on that basis.

The Defendant argues that Counts II and III of the amended complaint must be

dismissed because the Plaintiff fails to plead in an adequate manner the existence of an unsecured creditor with standing to avoid the subject transfers. Counts II and III are brought pursuant to the Plaintiff's avoidance powers under section 544(b) and require a so-called triggering creditor. In the amended complaint, the Plaintiff identifies by name several creditors with allowable unsecured claims who could have sought avoidance of the transfers to Bank Leumi. There is no need for the Plaintiff to allege the amounts of those unsecured claims, the specific date when they arose, or any other matter. The allegations in the amended complaint relating to the existence of triggering creditors are sufficient. The Motion to Dismiss cannot be granted on that basis.

The Defendant argues that it has the benefit of the defense established in 11 U.S.C. § 546(e) and so the Plaintiff may not pursue its claims under section 544 in Counts II and III.[1] Among other things, section 546(e) provides that, except where a trustee proceeds under the actual fraud provision of section 548(a)(1)(A), a trustee may not avoid a transfer that is a settlement payment made by or to (or for the benefit of) a financial institution.[2] The Defendant argues that the Bank Leumi Payoff was a "settlement payment" covered by section 546(e) and so the Defendant has a complete defense against any claim other than those brought under section 548(a)(1)(A).

The central question for the Court is whether the Bank Leumi Payoff was a settlement payment. "'[S]ettlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a

---

[1] The defense provided by section 546(e) precludes pursuit of certain avoidance actions but does not apply to actions under section 548(a)(1)(A). While Count I of the amended complaint is based on section 548(a)(1)(A), Counts II and III rely on section 544 and applicable state law. If applicable, the section 546(e) defense would prohibit pursuit of the claims presented in Counts II and III.

[2] There is no doubt that the Defendant is a financial institution.

final settlement payment, or *any other similar payment commonly used in the securities trade*." 11 U.S.C. § 741(8) (emphasis added).  Each of the items addressed in the definition of "settlement payment" involves a "security".  The term "security" is defined to include a "note." 11 U.S.C. § 101(49)(A)(i).  The Defendant argues that its Revolver and Term Loan were each evidenced by a promissory note, the Bank Leumi Payoff functioned to redeem the notes, and so the Bank Leumi Payoff was a settlement payment.

There is no binding case law interpreting the terms "settlement payment" and "securities contract" in the context of the Bankruptcy Code.  But the definition of the term "security" contained in the Bankruptcy Code is essentially identical to the definition used in the Securities Acts.  It is appropriate for the Court to consider precedent in connection with application of the Securities Acts to determine whether the Bank Leumi Payoff constituted a settlement payment.  *See Thompson v. Hornyak (In re Hornyak),* Nos. 08-09048, 10-09002, 2010 Bankr. LEXIS 1419, at *7-8 (Bankr. N.D. Ga. Apr. 1, 2010) (looking to Supreme Court precedent in the securities context to determine whether a note was a security for purposes of 11 U.S.C. § 523(a)(19)).

In *Reves v. Ernst & Young*, the United States Supreme Court established a test to determine when a note is a security within the meaning of the Securities Acts, because "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts." 494 U.S. 56, 63 (1990).  The Supreme Court concluded that certain types of notes that are not considered securities include a note delivered in consumer financing, a note secured by a mortgage on a home, a short-term note secured by a lien on a small business or some of its assets, a note evidencing a character loan to a bank customer, a short-term note secured by an assignment of accounts receivable, a note which simply formalizes an

10

open-account debt incurred in the ordinary course of business, and a note evidencing a loan by a commercial bank for current operations. *Id.* at 65 (citations omitted); *see also Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d 51, 54 (2d Cir. 1992) ("It is well-settled that certificates evidencing loans by commercial banks to their customers for use in the customers' current operations are not securities.")

The Bank Leumi Payoff represented payment on a commercial loan used for business operations. Under the *Reves* analysis, the related notes were not securities. Thus, the Bank Leumi Payoff was not a settlement payment and was not made in connection with a securities contract. Section 546(e) does not apply and the Motion to Dismiss cannot be granted on that basis.

Finally, the Defendant argues that the amended complaint lacks specific allegations to support the claim that the transfers at issue were made with actual intent to hinder, delay or defraud creditors. The Defendant argues that the Plaintiff fails to plead any badges of fraud, that the case does not involve a Ponzi scheme and the so-called Ponzi scheme presumption does not apply, and that allegations that the Defendant overlooked certain alleged "red flags" are simply red herrings. In response, the Plaintiff argues that there are allegations throughout the amended complaint that the Debtor made the transfers to the Defendant in furtherance of a fraudulent scheme and as part of an effort to hinder, delay, or defraud its creditors.

Because actual intent to defraud is difficult to prove, courts look to the totality of the circumstances and badges of fraud surrounding the allegedly fraudulent transfers. *In re Model Imperial, Inc.*, 250 B.R. at 790-91. The traditional badges of fraud include: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was not disclosed or was concealed; (4) before

11

the transfer was made the debtor had been sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. *Id.* at 791.

The Defendant was not an insider of the Debtor.  The Debtor did not retain control of the funds paid to the Defendant after the payment.  The transfers were not concealed.  It is not alleged that the Debtor had been sued or threatened with suit prior to the transfers and, even so, this badge of fraud is aimed at transfers where assets are moved away from the debtor's control so as to conceal them from creditors.  The transfers did not constitute all or substantially all of the Debtor's assets.  The Debtor did not abscond.   The Debtor did not remove or conceal assets except to the extent it concealed its actual financial condition, apparently also from the Defendant in this case.   The Debtor received exactly equal value for the transfers as it was satisfying its contractual obligations to the Defendant.  While it is suggested that the Debtor would have otherwise been unable to pay off the Bank Leumi Loan Facility, there are no specific allegations that would support the conclusion that the Debtor was insolvent at the time of any of the transfers or was made insolvent thereby.  The Bank Leumi Payoff followed immediately after the closing of the Bank Hapoalim Loan Facility, but this timing does not assist in the fraud analysis as the transfer merely resulted in one secured lender replacing another with the exact same deal.  There was no multiparty transfer through a lender to an insider.  Even the most liberal application of the traditional badges of fraud

would not support the relief requested in this case.

In cases where the debtor perpetrated a Ponzi or similar scheme, some courts have relied on the so-called Ponzi scheme presumption to find actual intent to hinder, delay, or defraud creditors.  Any transfer made in furtherance of such a scheme is deemed to have been made with actual fraudulent intent.  *Welt v. Publix Super Markets, Inc. (In re Phoenix Diversified Inv. Corp.)*, No. 08-15917-EPK, 2011 WL 2182881, at *3 (Bankr. S.D. Fla. June 2, 2011).  Schemes implicating this presumption typically involve obtaining funds from a series of investors over a period of time, and using funds obtained from later investors to pay "investment returns" to earlier investors, thereby perpetuating the scheme. *United States v. Rothstein (In re Rothstein, Rosenfeldt, Adler, P.A.)*, 717 F.3d 1205, 1207 n.5 (11th Cir. 2013). In such cases, the sole or a significant purpose of the debtor is to perpetrate the fraudulent scheme.  Here, the Debtor operated a legitimate business.  The fact that the Debtor defrauded two lenders in succession does not make that fraud a Ponzi scheme.  The Ponzi scheme presumption does not apply in this case.

In order to prosecute a claim based on actual intent to hinder, delay, or defraud a creditor, the Plaintiff must show that the alleged fraudulent intent is related to the transfers sought to be avoided.  *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56-57 (2d Cir. 2005).  The most common example is when a debtor transfers assets to an insider, for no consideration, when the debtor is involved in significant litigation or is being pursued by creditors, for the obvious purpose of placing the assets beyond the reach of creditors.  In such a case, the transfer achieves the debtor's fraudulent end.

The transfers addressed in the amended complaint were regular payments on the Debtor's commercial debt obligations, and the eventual payment in full of those obligations, in each case according to their terms.  The Plaintiff alleges that the Debtor, through Mr.

13

Cohen and others, misrepresented the true financial condition of the Debtor so as to obtain extensions of credit, including from the Defendant itself.  The Plaintiff states that regular payments on the Bank Leumi Loan Facility and the Bank Leumi Payoff were somehow in furtherance of the Debtor's bank fraud scheme.  But the Debtor's business was not bank fraud.  The Debtor was a wholesaler of beauty products.  The most the Plaintiff can say is that if the Debtor failed to remain current on the Defendant's loan, and did not obtain replacement financing from somewhere, the Debtor would have been unable to pay off the Defendant and the Debtor's legitimate business would have failed earlier than it did.  Taking all of the allegations in the amended complaint as proven, the Court would conclude only that the Debtor remained current on its commercial financing, and obtained replacement financing, for the purpose of continuing its legitimate business operation and not for the purpose of perpetuating bank fraud.  Put another way, the bank fraud was incidental to the Debtor's operations, not the purpose of the Debtor's operations, and the transfers in question were not undertaken with the aim of defrauding the banks.

The Court might reach a different conclusion if it was alleged that the Defendant had assisted in defrauding Bank Hapoalim.  For example, if the Defendant had learned of the fact that the Debtor had repeatedly misstated its financial condition, threatened to place the Bank Leumi Loan Facility in default and accelerate it, and then assisted the Debtor in misrepresenting the status of the Bank Leumi Loan Facility in order to permit the Debtor to obtaining financing from Bank Hapoalim so that the Defendant could be paid off.  The amended complaint hints at these kinds of facts, stating that the same person was the lending officer at both banks, that the Defendant no longer wished to have a lending relationship with the Debtor, and that other circumstances existed that the Plaintiff suggests were red flags for the Defendant, but there is no concrete allegation that would lead the Court to

14

believe any such conspiracy existed.  Even if the Defendant had become suspicious of the Debtor, mere suspicion does not amount to participation in a fraudulent scheme.

Lastly, the Plaintiff suggests that the Debtor's unsecured creditors were harmed by the continuation of the Debtor's business.  Other than a vague reference to "third party lenders" who have filed claims, there is no concrete allegation of fact to support this statement.  The Plaintiff does not allege even in a general way that the Debtor made the subject transfers with the intent to harm its unsecured creditors.  Indeed, there is nothing in the amended complaint, even if all its allegations are proven, that would lead the Court to conclude that the Debtor made contractual payments to the Defendant in order to defraud its unsecured creditors generally.

Hints and innuendo are not sufficient to support any necessary component of a claim, particularly a claim based in actual fraud.  The allegations in the amended complaint do not adequately allege actual intent to hinder, delay, or defraud creditors with respect to the transfers at issue. *See In re Sharp Int'l Corp.*, 403 F.3d at 56-57; *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474 (7th Cir. 2005).  The amended complaint is due to be dismissed.

In its original response to the Motion to Dismiss, the Plaintiff requested leave to further amend the amended complaint [ECF Nos. 30 and 31].  That response was replaced by an amended response pursuant to an order of this Court [ECF No. 37].  The amended response [ECF No. 40] does not request the right to further amend the amended complaint. Even if the Court considers the Plaintiff's original response, the request to further amend provides no detail as to how the Plaintiff would further amend the amended complaint to address the concerns raised in the Motion to Dismiss, and the request is procedurally improper. *Long v. Satz*, 181 F.3d 1275, 1279-80 (11th Cir. 1999) (per curiam); *Posner v. Essex Ins. Co.,* 178 F.3d 1209, 1222 (11th Cir. 1999) (per curiam) (a request for leave to amend

15

"imbedded within an opposition memorandum" is not "raised properly"; neither did the memorandum set forth new factual allegations that would cure the reason for dismissal). The Plaintiff is represented by counsel.  The Court is not required to grant leave to amend *sua sponte. Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc).

Accordingly, it is ORDERED AND ADJUDGED that the Motion to Dismiss [ECF No. 18] is granted and the amended complaint [ECF No. 14] is dismissed with prejudice.

###

Copies Furnished To:

Scott M. Grossman, Esq.

*Scott M. Grossman, Esq. is directed to serve a conformed copy of this Order on all appropriate parties and file a certificate of service.*